March 4, 2020

Court of international Trade

Case Management

1 Federal Plaza

New York, NY 10278

Subject: April 2018 Customs Broker License Exam Court Appeals

Name : Byungmin Chae

Social Security Number: XXX-XX-8669

Telephone Number: 646-678-0066

My Address: 2840 Legacy Commons Plaza #201
Omaha, NE 68130

Place of Examination: Queens College Law Library
65-21 Main Street Room 130- Queens Hall
Flushing, NY 11367

Date of Examination: 4/25/2018

Enclosures: This cover letter
A copy of the letter from CBP providing the applicant's score
A copy of the answers from CBP on 2nd appeal and
The list of the questions I am appealing

Dear Sir or Madam,

As the Customs and Border Protection (CBP) mailed the decision of the 2nd appeal to my old address which was 330 B Endeavor Pl College Point, NY 11356 after I moved out to new address of 2840 Legacy Commons Plaza #201 Omaha, NE 68130 in the year of 2018 I could not appeal on time to the court of international trade.

Please see the copy of the lease contract for your reference as the evidence of the new address.

I kindly hereby request the appeal of the following questions:

Q5, Q33, Q39, Q43, Q50, Q57

My score is 71.25% and credit for correct answers to 3 of these answers would have resulted in the passing score.

Thank you in advance for your consideration.

Sincerely,

Byungmin Chae

Byungmin Chae



Case 1:20-cv-00316-TMR Document 2 Filed 09/11/20 Page 2 of 17

byungmin chae <benchaeny@gmail.com>

**USPS® Item Delivered, Front Desk/Reception/Mail Room 9405503699300274390110**

1 message

**auto-reply@usps.com** <auto-reply@usps.com> Fri, Mar 6, 2020 at 12:38 PM

To: benchaeny@gmail.com

Hello **ben chae**,

Your item was delivered to the front desk, reception area, or mail room at 1:34 pm on March 6, 2020 in NEW YORK, NY 10278.

Tracking Number: **9405503699300274390110**

**Delivered, Front Desk/Reception/Mail Room**

previous delivery proof of evidence

**Tracking & Delivery Opti**

**My Account**

Visit **USPS Tracking**® to check the most up-to-date status of your package
digitally preview the address side of your incoming letter-sized mail and ma
soon! To update how frequently you receive emails from USPS, log in to your **USPS.com** account.

Want regular updates on your package? **Set up text alerts**.

Byungmin Chae
Exam Date: April 25 2018
Question # 33

33. What is the classification of current production wall art depicting abstract flowers and birds that is mechanically printed, via lithography, onto sheets of paper, the paper measuring .35mm in thickness that have been permanently mounted onto a backing of .50mm thick paperboard?

    A. 4911.91.2040
    B. 4911.91.3000 (CBP Answer)
    C. 4911.99.6000
    D. 9701.10.0000
    E. 9702.00.0000 (My Answer)

My Argument:

As the citation of choice B represents the paper or paperboard over 0.51mm in thickness choice B cannot be the best answer to the question for the paper or paperboard not over 0.51mm in thickness.

And the time of the printing as noted in the citation is not clear in the statement of the question to decide if choice B fits with time restriction.(not enough information)

And I would say choice B is not eligible for the correct answer and the credit should be made available to this question.



Byungmin Chae
Exam Date: April 25 2018
Question # 5

5. Which of the following customs transactions is not required to be performed by a licensed customs broker?

    A. Temporary Importation under Bond
    B. Transporation in bond (CBP Answer)
    C. Permanent Exhibition Bond
    D. Trade Fair Entry
    E. Foreign Trade Zone Entry (My Answer)

My Argument:

CBP answer is correct but my answer is also a correct answer. One does not need to have a customs broker's license to admit (enter) goods into a Foreign Trade Zone as noted in the 19 CFR 146.32 (a)(1) that the merchandise may be admitted(entered) into a zone only upon application on a CBP form 214 and the issuance of the a permit by the port director.

Webster dictionary defines "entry" as the act of entering or the act of making or entering a record. So, one could do an FTZ entry (admit goods into the FTZ) without a license.

Furthermore, the 19.C.F.R $ 111.1 does not define the difference between the admission and entry in this regard.

Byungmin Chae
Exam Date: April 25 2018
Question # 39

39. What is the classification of teacup that is made of a porcelain containing 28 percent of tricalcium phosphate, valued at $18 and offered for sale in the same pattern as all of the other articles listed in additional U.S. Note 6 (b) to Chapter 69, HTSUS, with the aggregate value of all those articles listed in that note being $900?

    A. 6911.10.2500 (CBP Answer)
    B. 6911.10.3810 (My Answer)
    C. 6911.10.5800
    D. 6911.10.8010
    E. 6912.00.4500

My argument:

6911.10.2500 says "tableware and kitchenware of bone chinaware valued over $31.50 per dozen pieces". Therefore, this brings up the price discrepancy of the bone chinaware over $31.50 per dozen pieces which contradicts the price of $18 in the question and, instead, I would say 6911.10.1500 which says " valued not over $31.50 per dozen pieces" would be best fit as the correct answer to the question.

For this reason there is no correct answer to this question and the credit should be made to this question.

Byungmin Chae
Exam Date: April 25 2018
Question # 43

43. What is the classification of a work glove, made of synthetic suede (a non-woven polyster fabric with the textile making up 85% of the weight and the plastic marking up 15%)? The glove features fortchettes, thermo-plastic rubber attachments on the knuckles on the back side, rubber overlays on the palm side of the thumb, and a cuff with a hook and loop closure to tighten the glove at the wrist.

A. 6116.10.7520 (My Answer)
B. 6216.00.2425
C. 6216.00.2925
D. 6216.00.5425
E. 6216.00.5820 (CBP Answer)

My argument:

CBP's answer of 6216.00.5820 points out the gloves of the man-made fibers with fourchettes but the gloves were coated or covered with the plastics or rubber, which is noted in the article description 6216.00 and choice C bears all the requirements. And that is the reason why both Choice C and Choice E could be the answers to the question and I thought that the question had the multiple answers to one question and should be invalidated and any choice should be credited.

Byungmin Chae
Exam Date: April 25 2018
Question # 50

50. The importer, company A, imports 1,000 batteries from an unrelated overseas seller at a price of $0.50 CIF per battery. The overseas seller buys the batteries in bulk from an overseas manufacturer. Company A requires each battery to be individually wrapped in polythene with a cardboard backing for display at retail outlets in the United States. Company A provides the polythene and cardboard backing materials free of charge to the overseas seller. Company A obtains the materials from a supplier in the United States at a cost of $40 for the quantity required to wrap 1,000 batteries. The seller of the imported batteries arranges for an overseas packing company to carry out the wrapping/packing. This company charges the seller of the imported goods, $60 per 1,000 batteries for this service. The documents show that the total overseas freight and insurance cost totaled $10. What is the customs value in the United States for a shipment of 1,000 batteries?

A. $530 (CBP Answer)
B. $500
C. $600 (My Answer)
D. $540
E. None of the above

My argument:

CIF means the Price Paid or Payable included the cost of the goods, insurance, and freight. Nowhere in the facts does it say that there is reason to subtract the freight and insurance. No proof of actual cost of insurance and freight has been made available to subtract them from the transaction value.

Here is the math:

$500 batteries (including freight and insurance, which cannot be subtracted)
$40 for the packing (19 CFR 152.102 (e)
$60 for the labor (19 CFR 152.102 (e)
$600 (MY ANSWER)

The citation includes the $40 of the package materials of the packing

And the packing cost of $60 which includes the labor in the production process from CFR 152.102 (e) should be included because it is packing cost to be packed ready for the shipment to the United States.

Byungmin Chae
Exam Date: April 25 2018
Question # 57

57. Which of the following shipments does not contain restricted gray market merchandise as defined in 19 C.F.R. 133.23?

A. A shipment of jeans, bearing a trademark registered and recorded in the United States, applied by a U.S. trademark owner's foreign licensee independent of the U.S. trademark owner
B. A shipment of shoes, bearing a trademark registered and recorded in the United States, applied under the authority of a foreign trademark owner other than the U.S. owner, a parent or subsidiary of the U.S. owner, or a party under common ownership or control with the U.S. owner, to who the U.S. owner sold the foreign title.
C. A shipment of jacket, bearing a trademark registered and recorded in the United States, applied under the authority of a foreign trademark owner other than the U.S. owner, a parent or subsidiary of the U.S. owner, or a party under common ownership or control with the U.S. owner, from whom the U.S. owner acquired the domestic title
D. A shipment of books, bearing a U.S. registered and recorded trademark applied by a foreign subsidiary of the U.S. owner, determined by CBP to be different from the books authorized by the U.S. owner for importation or sale in the United States. The books feature a conspicuous label that they are not authorized by the U.S. owner for importation into the U.S. and are physically and materially different from the authorized ones.(My Answer)
E. A shipment of shirts, bearing a genuine foreign trademark owned by a foreign trademark owner, identical with or substantially indistinguishable from a trademark registered and recorded in the United States. The shipment was imported without the authorization of the U.S. owner who is not related to the foreign owner.(CBP Answer)

My argument:

As noted in 19 C.F.R. 133.23 (a)(1) & (2) &(3) choice D has all the requirements to qualify that it does not contain the restricted gray market merchandise since

1) the label is attached in close proximity to the trademark
2) and it appears in its most prominent location on the books
3) and it was determined by CBP to be different from the books authorized by the U.S. owner for importation or sale in the United States

and I believe choice D should be the correct answer to the question while choice E has the restricted gray market merchandise since the shipment which was imported was not authorized by the U.S. owner who is not related to the foreign owner.

**Question 5:**

Which of the following customs transactions is **NOT** required to be performed by a licensed customs broker?

A. Temporary importation under bond
B. Transportation in bond
C. Permanent exhibition bond
D. Trade fair entry
E. Foreign trade zone entry

In grading the exam, CBP designated the correct answer as B. Pursuant to 19 C.F.R. § 111.2, only a licensed customs broker may perform "customs business," as defined in 19 C.F.R. §111.1. However, CBP specifically exempts some actions from customs business, allowing certain other parties to perform them. For example, in 19 C.F.R. § 11 1.2(a)(2)(iv), CBP permits a carrier to make entry for transportation in bond without being a broker. Accordingly, Answer B, transportation in bond, is the correct answer.

You state that credit should be given for Answer E, foreign trade zone (FTZ) entry, as an additional correct answer to Question 5. You state that "one does not need to have a customs broker 's license to admit (enter) goods into a Foreign Trade Zone [because] as noted in 19 C.F.R. § 146.32(a)( l) that the merchandise may be admitted (entered) into a zone only upon application on a CBP form 214 and the issuance of a permit by the port director." However, "foreign trade zone entry" is not "foreign trade zone admission." You provide the dictionary definition of "entry" as including the act of entering or the act of making or entering a record, which he then interprets as admitting goods to a FTZ. However, CBP regulations, not dictionary definitions, dictate the meaning of these words in the context of FTZs. For instance, Title 19, Part 146 of the Code of Federal Regulations (FTZs) contains a subpart for "Entry." Rather than covering application for admission procedures, this subpart covers the procedures for removal of foreign merchandise from a FTZ for entry into the customs territory of the United States. *See* 19 C.F.R. § 146.62.

Your argument is incorrect because a FTZ entry, as described in 19 C.F.R. § 146.62, concerns the entry of merchandise into the customs territory of the United States, including consumption entries. Moreover, this falls within the definition of customs business in 19 C.F.R.§ 111.l as a transaction with CBP concerning the entry and admissibility of merchandise. Accordingly, as a customs business activity, only a licensed customs broker may perform a FTZ entry per 19 C.F.R. § 111.2.

CBP's Answers

**Question 33:**

What is the CLASSIFICATION of current-production wall art depicting abstract flowers and birds that is mechanically printed, via lithography , onto sheets of paper, the paper measuring .35 mm in thickness that have been permanently mounted onto a backing of .50 mm thick paperboard?

A. 4911.91 .2040
B. 4911.91.3000
C. 4911.99.6000
D. 9701.10.0000
E. 9702.00.0000

In grading the exam, CBP designated the correct answer as B (4911.91.3000). Question 33 states that the merchandise consists of wall art that is mechanically printed, via lithography, onto sheets of paper measuring 0.35 mm in thickness that have been permanently mounted onto a backing of 0.50 mm thick paperboard. Pursuant to GRI 1, the wall art is classified in heading 4911, HTSUS, as "other printed matter, including printed pictures and photographs." The artwork is described as of current production (not over 20 years), consisting of a picture or design that is mechanically printed via lithography onto sheets of paper. Additional U.S. Note 1 to chapter 49 states that, "for the purposes of determining classification of printed matter produced in whole or in part by a lithographic process, the thickness of such printed matter is that of the thinnest paper contained therein, except that the thickness of a permanently mounted lithograph is the combined thickness of the lithograph and its mounting." In the article at issue, which consists of a permanently mounted lithograph, the combined thickness of the lithograph and its mounting is 0.85 mm. As the artwork features pictures of abstract flowers and birds, is not over 20 years at the time of importation, and is mechanically printed, via lithography, onto sheets of paper that have been permanently mounted onto a paperboard backing, with a combined thickness of over 0.51 mm, it is properly classified in subheading 4911.91.3000, HTSUS, which provides for "[o]ther printed matter, including printed pictures and photographs: Other: Pictures, designs and photographs: Printed not over 20 years at time of importation Other: Lithographs on paper or paperboard: Over 0.51 mm in thickness." Therefore, the correct answer is B.

Answer E is incorrect because note 2 to chapter 97 states that "for purposes of heading 9702, the expression 'original engravings, prints and lithographs' means impressions produced directly . . . of one or of several plates wholly executed by hand by the artist . . . not including any mechanical or photomechanical process." Where the subject merchandise is mechanically printed, it is excluded from classification in heading 9702, HTSUS. Pursuant to additional U.S. Note 1 to chapter 49, where the lithograph has been permanently mounted onto a backing, the thickness of a permanently mounted lithograph is the combined thickness of the lithograph and its mounting. Second, you state that there is not enough information in the question to determine the time of printing for purposes of classification in subheading 4911.91.3000, HTSUS, which requires that the merchandise not be over 20 years at the time of importation. Although the exact age of the item is not specified, the merchandise is described as "current production," meaning that at the time of importation, the merchandise was just produced. Accordingly, Answer B is correct.

**Question 39:**

What is the CLASSIFICATION of a teacup that is made of porcelain containing 28 percent of tricalcium phosphate, valued at $18, and offered for sale in the same pattern as all of the other articles listed in Additional U.S. Note 6(b) to Chapter 69, HTSUS, with the aggregate value of all these articles listed in that note being $900?

A. 6911.10.2500
B. 6911.10.3810
C. 6911.10.5800
D. 6911.10.8010
E. 6912.00.4500

In grading the exam, CBP designated the correct answer as A (6911.10.2500). Question 39 states that the merchandise consists of a porcelain teacup containing 28 percent of tricalcium phosphate, valued at $18. Pursuant to GRI 1, the porcelain teacup is classified in heading 6911, HTSUS, as "tableware and kitchenware, other household articles and toilet articles, of porcelain or china." There is no indication that the teacup is other than household tableware. Accordingly, it is classified in subheading 6911.10, HTSUS, which provides for "tableware and kitchenware." According to additional U.S. Note 5(b) to Chapter 69, HTSUS, bone chinaware is defined as "chinaware or porcelain the body of which contains 25 percent or more of calcined bone or tricalcium phosphate." Because the porcelain teacup contains 28 percent tricalcium phosphate, it is considered bone chinaware pursuant to additional U.S. Note 5(b) to Chapter 69. Therefore, the porcelain teacup is accurately described by the terms of subheading 6911.10.2500, HTSUS.

Answer B (6911.10.3810) is incorrect because as bone chinaware, the merchandise cannot be classified as "other" than bone chinaware, whether or not the inferior terms regarding sets apply to the merchandise. You state that Answer B should be given credit because there is no correct answer among the choices listed. You state that subheading 6911.10.2500, HTSUS, which provides for "tableware and kitchenware of bone chinaware valued over $31.50 per dozen pieces," contradicts the price of $18 that is identified in the question prompt. For this reason, you contend that subheading 6911.10.1500, HTSUS, which provides for tableware and kitchenware "valued not over $31.50 per dozen pieces," which is not among the answer choices, is the correct classification. Your analysis of the question is flawed because the teacup's value as described in the question prompt is for a single teacup, not for a dozen pieces. A dozen pieces of this $18 teacup would be valued at over $31.50 per dozen pieces. Answer A is the correct answer to this question.

**Question 43:**

What is the classification of a work glove, made of a synthetic suede (a non-woven polyester fabric with the textile making up 85% of the weight and the plastic making up 15%)? The glove also features fourchettes, thermos-plastic rubber attachments on the knuckles on the back side, rubber overlays on the palm side of the thumb, and a cuff with a hook and loop closure to tighten the glove at the wrist.

A. 6116.10.7520
B. 6216.00.2425
C. 6216.00.2925
D. 6216.00.5420
E. 6216.00.5820

CBP has determined that the correct answer choice is E, subheading 6216.00.5820, HTSUS, which provides for "[g]loves, mittens and mitts: Other: Of man-made fibers: Other: With fourchettes ."

You selected answer choice A and argued:

> CBP's answer of 6216.00.5820 points out the gloves of the man-made fibers with fourchettes but the gloves were coated or covered with the plastics or rubber, which is noted in the article description 6216.00 and choice C bears all the requirements. And that is the reason why both Choice C and Choice E could be the answers to the questions and I thought the question had the multiple answers to one question and should be invalidated and any choice should be credited .

Answers A, B, and C are incorrect because the gloves are not impregnated, coated or covered with plastics or rubber.

**Question 50:**
The importer, Company A, imports 1,000 batteries from an unrelated overseas seller at a price of $0.50 CIF battery. The overseas seller buys the batteries in bulk from an overseas manufacturer. Company A requires each battery to be individually wrapped in polythene with a cardboard backing for display at retail outlets in the United States.
Company A provides the polythene and cardboard backing materials free of charge to the overseas seller. Company A obtains the materials from a supplier in the United States at a cost of $40 for the quantity required to wrap 1,000 batteries. The seller of the imported batteries arranges for an overseas packing company to carry out the wrapping/packing. This company charges the seller of the imported goods $60 per 1,000 batteries for this service. The documents show that the total overseas freight and insurance costs totaled $10. What is the customs value in the United States for a shipment of 1,000 batteries?

   A. $530
   B. $500
   C. $600
   D. $540
   E. None of the above

The correct answer is A. To establish a customs value for the 1,000 batteries, the following must be done:
   (1) Adjust the price for the 1,000;
   (2) Consider the polythene and cardboard backing provided by the importer free of charge to the manufacturer, used in connection with the production or sale for export;
   (3) Make the necessary overseas freight and insurance adjustments.

   CIF price = .50 CIF x 1,000 = $500 CIF
   Plus assist = $40
   The customs value is $540 CIF
   FOB value (custom value in the United States): $540 - $10 (freight and insurance) = $530

The $60 the seller pays an overseas packing company to carry out the wrapping/packing operation is not a dutiable assist. It is a cost to the seller which one expects the seller to factor into the selling price of the merchandise. It is not a separate cost paid by the buyer for the packing of the goods, that is, an assist. In addition, the $10 for freight and insurance is deductible from the CIF price to reach an FOB price. Therefore, the only correct answer is Answer A.

**Question 57**
Which of the following shipments does not contain restricted gray market merchandise as defined in 19 C.F.R. § 133.23?

A. A shipment of jeans, bearing a trademark registered and recorded in the United States, applied by a U.S. trademark owner's foreign licensee independent of the U.S. trademark owner.
B. A shipment of shoes, bearing a trademark registered and recorded in the United States, applied under the authority of a foreign trademark owner other than the U.S. owner, a parent or subsidiary of the U.S. owner, or a party under common ownership or control with the U.S. owner, to whom the U.S. owner sold the foreign title.
C. A shipment of jackets, bearing a trademark registered and recorded in the United States, applied under the authority of a foreign trademark owner other than the U.S. owner, a parent or subsidiary of the U.S. owner, or a party under common ownership or control with the U.S. owner, from whom the U.S. owner acquired the domestic title.
D. A shipment of books, bearing a U.S. registered and recorded trademark applied by a foreign subsidiary of the U.S. owner, determined by CBP to be different from the books authorized by the U.S. owner for importation or sale in the United States. The books feature a conspicuous label that they are not authorized by the U. S. owner for importation into the U.S. and are physically and materially different from the authorized ones.
E. A shipment of shirts, bearing a genuine foreign trademark owned by a foreign trademark owner, identical with or substantially indistinguishable from a trademark registered and recorded in the United States. The shipment was imported without the authorization of the U.S. owner who is not related to the foreign owner.

The correct answer is E. Under 19 C.F.R. § 133.23, restricted gray market articles are articles featuring a mark applied under the authority of the U.S. trademark owner, but not allowed by the trademark owner for importation into the U.S. The subject shirts bear marks that were not applied under the authority of the U.S. trademark owner. The fact that they bear a genuine foreign trademark is irrelevant, since trademark rights are territorial in nature and trademarks are not entitled to protection beyond their area of registration.

You state "as noted in 19 C.F.R. 133.23 (a)(1 ) & (2) &(3) choice D has all the requirements to qualify that it does not contain the restricted gray market merchandise since the label is attached in close proximity to the trademark and it appears in its most prominent location on the books and it was determined by CBP to be different from the books authorized by the U.S. owner for importation or sale in the United States and I believe choice D should be the correct answer to the question while choice E has the restricted gray market merchandise since the shipment which was imported was not authorized by the U.S. owner who is not related to the foreign owner."

Reviewing the applicable provisions of Title 19 Code of Federal Regulations reveals that the your argument is incorrect. Title 19 C.F.R. §133.23(a) defines restricted gray market articles as,

".. .foreign-made articles bearing a genuine trademark or trade name identical with or substantially indistinguishable from one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States and imported without the authorization of the U.S. owner." (Emphasis added). Answer (E) states that the merchandise bears "a genuine foreign trademark owned by a foreign trademark owner...." (Emphasis added). Therefore, the correct answer is Answer E.





APARTMENT ASSOCIATION of NEBRASKA

# APARTMENT LEASE CONTRACT

Date of Lease Contract: October 18, 2018
(when the Lease Contract is filled out)

***This is a binding document. Read carefully before signing.***

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract)*:

Byungmin Chae, Jee Yeon Hwang

and *us*, the owner: NS-Legacy Apts LLC

*(name of apartment community or title holder)*. You've agreed to rent Apartment No. 2840-201 at 2840 Legacy Commons Plaza *(street address)* in Omaha *(city)*, Nebraska, 68130 *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written or electronic notice to or from our managers constitutes notice to or from us. The following person or entity is authorized to manage the apartment, to act on behalf of the owner, for the purpose of service of process and for the purpose of receiving and receipting for rent, notices and demands:

The Lund Company

... se Contract, ... is attached.

2\. ... by you and ... t):

... listed above ... 14 consecutive days without our prior written consent, and no more than twice that many days in any one month. If the previous space

Proof of new address

**5. KEYS AND FURNITURE** You will be provided 2 apartment key(s), 2 mailbox key(s), and 2 other access devices for fob. Your apartment will be *[check one]*: ☐ furnished or ☒ unfurnished.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ 1087.00 per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☒ at Drop Box

Prorated rent of $ 490.90 is due for the remainder of the *[check one]*: ☒ 1st month or ☐ 2nd month, on ____, ____

Otherwise, you must pay your rent on or before the 1st day of each month (due date). You must not withhold or offset rent unless authorized by statute. If you fail to pay rent within 3 days after we have given you written notice of your nonpayment and of our intent to terminate your tenancy if rent is not paid within this 3-day period, we may then terminate your tenancy and obtain possession of the premises. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the 5th day of the month. day of the month, you'll pay an initial late charge of $ 75.00 plus a late charge of $ 5.00 per day after that date until paid in full. To the extent permitted by applicable law, you'll also pay a charge of $ 35.00 for each returned check or rejected electronic payment, plus initial and daily late charges from due date until we receive acceptable payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. If owner files a lawsuit to evict resident for nonpayment of rent, resident agrees to pay a reinstatement fee of $ 290.00 to cover the administrative costs incurred by the owner for preparing to file said lawsuit, along with all other rent and charges set forth in this Lease Contract prior to dismissal of the lawsuit. The reinstatement fee is separate and distinct from attorneys fee incurred by owner for filing a lawsuit to evict a tenant for nonpayment of rent. If you violate the animal restrictions of paragraph 27 (Animals) or other animal rules, you'll pay an initial charge of $ ____ per animal (not to exceed $100 per animal) and a daily charge of $ ____ per animal(not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is finally removed. We'll also have all other remedies allowed at law and under this Lease Contract for such violation. This amount shall be due and payable as additional rent under the terms of this Lease Contract on or before the first day of the month following notice to you of such charges. All payment obligations under this Lease Contract shall constitute rent under this Lease Contract.

2020 SEP 11 A 10: 16